## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELEWARE

| | |
|---|---|
| SIEMENS USA HOLDINGS, INC.; and SIEMENS INDUSTRY, INC., <br><br> Plaintiffs, <br><br> v. <br><br> RICHARD J. GEISENBERGER, in his capacity as the Secretary of Finance for the State of Delaware; BRENDA MAYRACK, in her capacity as the Delaware State Escheator; and MICHELLE M. SULLIVAN in her capacity as the Assistant Director of the Office of Unclaimed Property, and the STATE OF DELAWARE, <br><br> Defendants. | C.A. No. ___ |

## VERIFIED COMPLAINT FOR EQUITABLE, DECLARATORY, INJUNCTIVE AND OTHER RELIEF

Plaintiffs Siemens USA Holdings, Inc. on behalf of itself and certain of its subsidiaries ("Siemens USA" or "SUSA"), and the building technologies business of Siemens Industry, Inc. (formerly Siemens Building Technologies, Inc.) ("SBT") (Siemens USA and SBT are referred to collectively as "Plaintiffs"), for their claims against Defendants Richard J. Geisenberger, in his capacity as the Delaware Secretary of Finance (the "Secretary"), Brenda Mayrack, in her capacity as the Delaware State Escheator (the "State Escheator"), and Michelle M. Sullivan, in her capacity as the Assistant Director of the Office of Unclaimed Property (the "Assistant Director)" (collectively, the "Defendants"), and the State of Delaware (the "State" or "Delaware"), and seek a declaratory judgment, a permanent injunction, and a refund of at least

$5,638,785 of an advance deposit Plaintiffs made against potential unclaimed property liability that Defendants and Delaware refuse to return, and allege as follows:

## NATURE OF THE ACTION

1.     Plaintiffs seek purely legal declarations of federal common law and declarations that unambiguous provisions of Delaware's new unclaimed property law, 12 *Del. C.* §§ 1101, *et seq.* (the "UPL"), conflict, facially and "as applied" by Defendants and Delaware, with federal common law and are preempted.  Plaintiffs bring claims for federal preemption, and violations of substantive and procedural due process under the Fourteenth Amendment to the United States Constitution, as well as violations of the Fourth Amendment based on (a) Defendants use of estimation to identify unclaimed property, (b) Defendants' ongoing conduct of an unauthorized ten-year audit of property over which Delaware lacks escheat jurisdiction under federal common law and Defendants' refusal to conclude that audit by the December 6, 2019 statutory deadline; (c) Plaintiffs' inability to challenge Defendants' authority to terminate Plaintiffs' statutory election to expedite and conclude their audit by December 6, 2019 because the UPL does not provide for pre-compliance review of the State Escheator's termination decision; (d) Defendants' retroactive application of new statutes that the General Assembly expressly made effective prospectively, and (e) Defendants' use of a self-interested contingent fee contract auditor to conduct the audit, make evidentiary decisions, and determine unclaimed property liability.

2.     Defendants issued to Plaintiffs two Interim Status Reports, one for SUSA calculating $22,406,758.17 of liability, of which $21,280,167.37 (95%) is a mere estimate (*see* Exhibit A, p. 2), and the other for SBT calculating $17,788,691.36 of liability, of which $16,538,946.61 (93%) is a mere estimate (*see* Exhibit B, p.2) (for an average of 94% combined). Defendants cannot identify any fixed and certain debts owed to any individual creditors for 94%

of the calculated liability and seek to expropriate it from Plaintiffs by simply calling the funds "abandoned property" payable to Delaware in violation of (1) well-established federal common law, which rejects the use of estimation and expressly preempts state laws, thus violating the Supremacy Clause, Article VI, Clause 2 of the United States Constitution, and Article 3 of the United States Constitution, (2) Plaintiffs' rights to substantive and procedural due process as guaranteed by the Fourteenth Amendment to the United States Constitution and the Full Faith and Credit Clause; and (3) Plaintiffs' right against unreasonable searches and seizures in violation of the Fourth Amendment to the United States Constitution.

3.      Plaintiffs also bring this action pursuant to 42 U.S.C. § 1983 to enjoin Defendants' deprivation of Plaintiffs' rights, privileges and immunities as guaranteed by the Constitution of the United States.

4.      Plaintiffs seek a declaratory judgment and injunctive relief to prevent enforcement of the UPL against Plaintiffs by enjoining a ten-year old unauthorized audit of property Delaware cannot claim under federal law, and seek a refund of excess funds deposited with Delaware as an advance payment against findings of liability by Delaware's auditors, which findings have now been finalized.

5.      Delaware waived sovereign immunity with respect to Plaintiffs' refund claim, both in the UPL (12 *Del. C.* § 1179(b)(2) (authorizing a company to sue for a refund)) and in a private Audit Compromise Agreement (the "Letter Agreement") dated November 12, 2009 (as amended) which, as discussed below, Delaware and Plaintiffs executed to govern the audit.

6.      Further, the UPL provides that "[a]ny person claiming an interest in any property paid or delivered to the State Escheator under this chapter may file a claim with the State Escheator for the property or for the proceeds from the sale of the property" (12 *Del. C.*

§ 1165(a)) and "[t]he State Escheator shall pay or deliver property to a claimant under § 1165 of this title if the State Escheator receives evidence sufficient to establish to the reasonable satisfaction of the State Escheator that the claimant is the owner of the property."  *Id.* § 1166. Plaintiffs seek to reclaim overpaid funds the State Escheator is refusing to refund by bringing this lawsuit.

**Federal Preemption – Historical Background and Context**

7.     Plaintiffs seek purely legal determinations based on unambiguous federal law, as well as unambiguous statutory and regulatory language in the UPL, and undisputed facts for which historical context is important.

8.     States, as sovereigns, may take custody of abandoned property for safekeeping and public use until the true owner reclaims it.  Because intangible property cannot be located on a map (*i.e.*, debts, for example, evidenced by an uncashed check), states were asserting conflicting claims to the same property, thereby exposing private parties to liability from multiple states, which the Supreme Court of the United States held violates substantive due process rights in *Western Union Telegraph Comp. v. Pennsylvania*, 368 U.S. 71, 75 (1961).

9.     The Supreme Court, in the exercise of its original jurisdiction to resolve disputes between states, established, reaffirmed and explained the federal common law governing unclaimed property (also referred to as "escheats") in a trilogy of cases -- *Texas v. New Jersey*, 379 U.S. 674 (1965), *Pennsylvania v. New York*, 407 U.S. 206 (1972), and *Delaware v. New York*, 507 U.S. 490 (1993) (collectively, the "*Texas* Trilogy").  The purpose of the federal law was to settle "the question of which State will be allowed to escheat intangible property." *Delaware*, 507 U.S. at 498 (citing *Texas*, 379 U.S. at 677).

- 4 -

10.     The *Texas* Trilogy expressly preempts conflicting state laws.  The Supreme Court expressly held that no state may supersede the federal common law, *id*. at 500, and the U. S. Court of Appeals for the Third Circuit and the Delaware Superior Court held that private parties have standing to enforce the federal law in a dispute with a state.[1]   *Marathon Petroleum Corp. v. Sec'y of Finance*, 876 F.3d 481, 493 (3d Cir. 2017); *Temple-Inland Inc. v. Cook*, 192 F.Supp. 3d 527, 532 n. (D. Del. 2016) (citing *Delaware v. Card Compliant LLC*, C.A. No. N13C-06-289 PSS [CCLD] at 6, 21 (Del. Super. Ct. Nov. 23, 2015)).

11.     Federal law (referred to as the "priority rules") requires a three-step analysis: First, a state must determine from a debtor's books and records whether a legally enforceable fixed and certain obligation to a creditor exists.  Second, if so, the state of the creditor's last known address as shown on the debtor's books and records may take custody of the property under what is referred to as the "primary rule."  Third, if the primary rule fails because the debtor's books do not contain a creditor's address for specific property, the debtor's state of incorporation may take custody of the property under what is referred to as the "secondary rule." *See Delaware*, 507 U.S. at 499-500 (describing the three steps); *Marathon Petroleum*, 876 F.3d at 490 (same).

12.     As federal courts, state courts, and commentators have recognized since long before the *Texas* Trilogy under what is referred to as the "derivative rights doctrine," states' rights in abandoned property are custodial and thus derive from the owner's rights;  a state's obligation as custodian is to protect the owner's rights until the owner reclaims them.

---

[1] Because the federal common law governing escheats was not created by statute, citations herein are to the source of the law in the Supreme Court cases that established it.

13.     As this Court recognized in *Temple-Inland*, 192 F.Supp. 3d at 545, the Supreme Court incorporated the derivative rights doctrine into the threshold step in the federal law analysis by requiring a state first "to determine the precise debtor-creditor relationship as defined by the law that creates the property at issue." *Delaware*, 507 U.S. at 499.  The Supreme Court stated that "our examination of the holder's legal obligations not only defined the escheatable property at issue but also carefully identified the relevant 'debtors' and 'creditors.'"[2]  *Id.* at 503.

14.     Consistent with the threshold step in the escheat analysis, both before and after the *Texas* Trilogy, courts repeatedly have held that states have the burden of identifying a property right "that actually belongs to the absentee,  …; it cannot simply expropriate money belonging to the obligor." *Louisiana Health Serv. and Indemnity Co. v. McNamara*, 561 So. 2d 712, 718 (La. 1990); *see also California v. Bank of America, ex rel. McCann v. Bank of America, N.A.*, 191 Calif. App. 4th 897, 910-11 (2001) (a state must identify fixed and certain obligations; it cannot simply claim journal entry write-offs to a suspense account for unidentifiable interbank transfer imbalances); *Kane v. Insurance Co. of North Am*, 392 A.2d 325, 329 (Pa. Cmwlth. Ct. 1978) (state must prove that payees of uncashed checks "were unqualifiedly entitled to same."); *State v. Sperry & Hutchinson Co.*, 153 A.2d 691, 700 (App. Div. 1959, *aff'd* 157 A.2d 505 (N.J. 1960) (state could not create aggregate rights to itself for unredeemed trading stamps through estimation where the state did not prove such rights existed for individual stamp collectors, even where the estimate of overall stamps that remain unredeemed was reasonable).

---

[2] In escheat parlance, "creditor" and "owner" are used interchangeably, and "debtor" and "holder" are used interchangeably.  *Marathon Petroleum*, 876 F.3d 481, 489-90 (3d Cir. 2017).

15.     Consistent with the derivative rights doctrine, the UPL defines "property" to mean "tangible property … or a fixed and certain interest in intangible property held, issued, or owed in the course of a holder's business … ."  12 *Del. C.* § 1130(18).

16.     The Supreme Court emphasized that its purpose was to establish a federal law that was easy to administer and would avoid deciding "each escheat case on the basis of particular facts or to devise new rules of law to apply to ever-developing new categories of fact." *Delaware*, 507 U.S. at 509 (quoting *Texas*, 379 U.S. at 679 and *Pennsylvania*, 407 U.S. at 215).

17.     The Supreme Court expressly rejected the use of statistical surrogates and estimation to determine the amount a state may claim as abandoned property and refused to vary the federal rules based on the adequacy of a debtor's records, instead admonishing states that nothing prevented them from requiring companies to retain records to enable states to determine if a company possesses abandoned property a state may claim.  *Delaware.* 507 U.S. at 509 and n.12.

18.     This is well-settled law.  Indeed, the Delaware Chancery Court recognized that ease of administration "was an overriding factor"; thus, "to facilitate ease of administration," Delaware must rely on the creditor's address "'as shown by the debtor's books and records'," even where Delaware asserted that the debtor's books and records showed an incorrect creditor, because it would "resort to evidence beyond the debtor's books and records in order to be sustained." *See Nellius v. Tampax, Inc.* 394 A.2d 233, 236-37 (Del. Ch. 1978) (quoting *Texas*, 379 U.S. at 681).

19.     Even though Delaware was a party in *Delaware*, Delaware did not heed that admonishment and did not enact a record retention requirement.

20.     After *Pennsylvania*, financial institutions lobbied Congress to replace the secondary rule in *Texas* as applied to "address unknown" money orders, Travelers Checks, official checks and similar instruments.  Congress responded by enacting 12 U.S.C. §§ 2501-03, which gives escheat authority to the state in which those instruments were sold (*i.e.*, a "place of purchase" rule), not the state of incorporation of the seller as otherwise applies under the secondary rule.

21.     After *Delaware*, many states began lobbying Congress to enact a federal escheat statute that would replace the secondary rule altogether and eliminate any priority claim by the state of incorporation.  As the favored state of incorporation, Delaware wanted to avoid this change and thus entered into a settlement agreement in 1994 with the other states pursuant to which they agreed to maintain the *status quo* for ten years in exchange for monetary payments from Delaware.  *See An Assessment of Delaware's Abandoned Property Laws:  A Report Submitted in Fulfillment of House Resolution* 96 by the Abandoned Property Study Committee, dated February 6, 2001 (the "2001 Report"), at pp. 4-5, attached as <u>Exhibit C</u> hereto.

22.     The Department of Finance knew that "[o]wner unknown property made up the vast majority of Delaware's abandoned property receipts" and if the secondary rule was changed by Congress or a court ruling, "Delaware's Abandoned Property collections would be eviscerated."  *See Delaware's General Fund Revenue Portfolio*, A Report Submitted in Fulfillment of Senate Joint Resolution No. 5, 144th General Assembly, Department of Finance, dated February 2008 (the "2008 Report"), at p. 65 (relevant pages attached as <u>Exhibit D</u>; full report available at www.finance.delaware.gov.publications.GP2008,

23.     It was not until 2001 that Delaware had a formal audit program to enforce compliance with the UPL.  *See Unclaimed Property Taskforce Report, A Report Submitted in*

*Fulfillment of House Resolution No. 43*, dated April 2006 (the "2006 Report"), at 11, relevant pages attached as Exhibit E hereto.  As reported in 2001 by Delaware's Abandoned Property Study Committee:

> [A]udits [were] arranged on an ad hoc basis.  Delaware sign[ed] on audit-by-audit, and on 'me, too' basis.  That is, Delaware participates in contingency fee audit agreements only to the extent that the audit would proceed in any event and other states could lay claim to property rightfully escheatable to Delaware under *Delaware v. NY*.

*See* 2001 Report (Exhibit C), at 6.  Those auditors primarily audited equity (*i.e.*, stock, dividends, debt), which was the property at issue in *Delaware* and was identified from books and records; it was never estimated.

24.     Historically, even though there are more than 680,000 companies incorporated in Delaware, fewer than 2,300 reports were filed annually.  *See* 2008 Report, at p. 64 (Exhibit D).

25.     Delaware's legislators and administrators knew from a 2001 report by the Abandoned Property Study Committee that the low rate of compliance (a) "was not the result of willful noncompliance but was due to a lack of awareness of the unclaimed property rules" (2001 Report, Exhibit C, at p. 5 n.3)  (indeed, the UPL is in Title 12 of the Delaware Code governing "Decedents' Estates and Fiduciary Relations," not a Code commercial enterprises look for statutes governing corporations) and (b) "Delaware has relatively few owners of unclaimed property and only a small number of firms headquartered in the state."  2001 Report, Exhibit C, at p. 5.  *See also* 2008 Report (Exhibit D), at p. 65.

26.     Further, there has always been a very small community of experts to advise companies on unclaimed property compliance.  As the Department of Finance reported in 2008, "this group of experts is somewhat insular" and thus companies did not learn of Delaware's enforcement conduct until and unless they were audited.  *See* 2008 Report (Exhibit D), at 66.

27.     In late 2001, Delaware retained Kelmar Associates, LLC ("Kelmar"), a private contract auditor, to begin conducting Delaware's audits of compliance with the UPL on a contingent fee basis. Kelmar was formed in October 2001 by accountants from Big Four accounting firms that had been advising companies in unclaimed property compliance and developed a plan for exploiting them in audits and collecting large contingent fees.  Delaware retained Kelmar to conduct 90% of their unclaimed property audits.

28.     Delaware and Kelmar then focused on enforcement and targeted large companies where there was "a greater chance of escheatable property being collected."   Minutes of Unclaimed Property Task Force meeting dated August 12, 2014 (the "2014 Task Force Meeting"), at p. 12 (Secretary of State Bullock speaking), attached as Exhibit F hereto.   The Department of Finance recognized in its 2008 Report that "the escheat enforcement base is made up of relatively few holders (which changes every year), each of which account for significant part of the revenue stream."  2008 Report (Exhibit D), at p. 66.

29.     The UPL has strict confidentiality provisions, 12 *Del. C.* § 1189, making it a misdemeanor punishable by fines and imprisonment for any State officer, employee, or contractor to disclose the amount of unclaimed property reported or received from audited companies and any assessments issued or settlements reached with them.  And at an August 12, 2014 meeting of the Delaware Unclaimed Property Task Force, then-Deputy Secretary David Gregor admitted that "there are [audit] guidelines approved by the DOF [Department of Finance] but they are not published for the public," adding to the secrecy.  *See* 2014 Task Force Meeting, at p. 14 (attached as Exhibit F hereto).

30.     This enabled Kelmar to begin secretly estimating significantly inflated liabilities in the millions of dollars that companies could not refute in the absence of records, and then

extorting millions of dollars by offering to settle for as much as 20%-50% to induce companies to think they were getting a bargain and inducing them to enter into reduced, but still egregiously inflated confidential settlements.   Kelmar was assigned to 90% of Delaware's audits.

31.     Delaware thus created a large revenue source (the burden of which was exported and imposed primarily on Delaware corporations located outside of Delaware), because estimates have no actual owners to reclaim the funds and mutual releases in the confidential settlement agreements prevented audited companies from reclaiming or disclosing payments.

32.     Whereas abandoned property revenue in 1993 was $31.7 million (https://finance.delaware.gov/financial-reports/delaware-fiscal-notebook/sections-1-2/ at p. 24), ten years later in fiscal 2003, that revenue source grew to $224.8 million becoming Delaware's third largest source of revenue (*id.* at p. 27).  In fiscal 2018, Delaware collected $551.7 million in escheat revenues and returned only $45.5 million (8.2%) to owners, netting $506.2 million for Delaware's use.   *See* Exhibit G hereto and https://finance.delaware.gov/financial-reports/delaware-fiscal-notebook/sections-1-2/ at p. 31 (fiscal 2018).  With the exception of one year, the percentage of Delaware's returns of property to owners has always been in the single digits.

33.     Fees paid to Kelmar grew proportionally.  In fiscal 2004, Delaware paid Kelmar fees of $ 3.9 million; ten years later in fiscal 2014 alone, Delaware paid Kelmar $53.5 million in fees.  *See* Vendor Payments by period, attached as Exhibit H.

34.     In 2008 the Department of Finance reported that enforcement activities were "still in their infancy," 2008 Report (Exhibit D) at p. 64, but it was concerned about the reliability of unclaimed property as a source of revenue because, if information "regarding a state's collection

or negotiation practices is not checked, holder advocates will seek to verify, and in some cases, exploit the veracity of misinformation to their client's benefit." *See id.* 66.

35.     Those concerns were realized in 2016 when *Temple-Inland v. Cook* threatened this revenue source by ruling that, *inter alia*, (a) Delaware could not estimate unclaimed property retroactively, especially in the absence of a record retention requirement that would otherwise enable companies to refute an unreasonable estimate, 192 F.Supp. 3d at 545-547, and (b) Defendants' estimation methodology created "significantly misleading results" and was an improper use of estimation because estimates were based largely on property with owner addresses in other states, property Delaware could not claim under federal law, *id.* at 549.

36.     In *Temple-Inland* and here, Defendants justified the use of estimation by arguing that if records do not exist, addresses do not exist, and therefore Delaware can use estimation to create aggregate rights to itself for abandoned checks and customer credits under the secondary rule, *id.* at 549, thereby avoiding having to prove the existence of any property rights belonging to individual owners.

37.     This Court rejected that theory, pointing out that the Supreme Court based the secondary rule on the existence of identifiable legally-enforceable property rights where the four corners of the property and/or the debtor's records lacked an owner address, and thus held that Delaware's interpretation of the secondary rule went to "troubling lengths." The Court held that if other states also can estimate based on the same property, there is a risk of liability to more than one state, precisely what the *Texas* Trilogy was designed to prevent. *Temple-Inland*, 192 F.Supp. 3d at 549.

38.     After *Temple-Inland*, Delaware repealed and replaced the UPL, effective February 2, 2017, primarily to restructure and renumber it, so most provisions remain

unchanged, except as stated below.  For example, the UPL provided that unclaimed or abandoned property is "property against which the full period of dormancy has run."  12 *Del. C.* § 1998(1)(repealed).  The "period of dormancy" is "the full and continuous period of 5 years ... during which an owner has ceased, failed or neglected to exercise dominion or control over property ... or to do any other act in relation to or concerning such property."  *Id.* § 1198(9)a (repealed).  Current law is substantively unchanged.  *See* 2 *Del. C.* §1133 ("When property presumed abandoned").

39.    New provisions of the UPL authorize the State Escheator to conduct audits with a look back period of fifteen years (*id.* § 1172(h)) and for the first time require companies to retain records for that fifteen-year period consisting of:

1.      The verifiable information required to be included in the report.
2.      The date, place, and nature of the circumstances that gave rise to the property right.
3.      The amount or value of the property.
4.      The last address of the owner, if known to the holder.

12 *Del. C.* § 1145.

40.    Because, as Defendants admit, companies typically retain records for seven years under standard record retention policies (or longer if guided by relevant statutes of limitation), § 1145 imposes new obligations with which companies cannot possibly comply until the passage of time allows them to accumulate fifteen years of records prospectively.

41.    Nevertheless, § 1176 of the new UPL authorizes estimation if a company fails to comply with § 1145:

(a) If a person subject to examination … does not retain the records required by § 1145 of this title, the State Escheator may determine the amount of property due using a reasonable method of estimation based on all information available to the State Escheator, including to extrapolation and the use of statistical sampling when appropriate.

> (b) The Secretary of Finance … shall, … promulgate regulations regarding the method of estimation …

12 *Del. C.* § 1176.

42.     Notwithstanding *Temple-Inland*, the Secretary of Finance promulgated regulations, effective October 1, 2017, instructing the State Escheator to estimate unclaimed property escheatable to Delaware by ignoring creditor addresses altogether and basing estimates on property escheatable to all states combined in the Base Years as a surrogate for abandoned property escheatable only to Delaware in the audit "Reach Back Period" (*i.e.*, the period where records do not exist).  Specifically, § 2.19 of the regulations provides:

> If for certain periods the amount of reportable property cannot be ascertained from the books and records of the Holder, projection techniques may be used to determine the reportable amounts for such periods.  Such determination shall be made by first examining records during periods in which records exist to establish a "Base Period" of data from which statistical inferences can be made for periods in which records are incomplete or do not exist.  To the extent permitted by law, ***names and addresses identified in the Base Period shall not be used to determine which state has the priority claim to the abandoned property estimated to be due over periods where records of owners' addresses do not exist.***

21 De Admin. Code 336 §104-2.19 (emphasis added).

43.     Here, Defendants are auditing checks and customer credits in the Base Periods with owner addresses in other states that Delaware cannot claim and ignoring owner addresses to estimate the amount Delaware can claim from Plaintiffs as abandoned property in violation of federal common law.

44.     In sum, for their federal preemption claims, Plaintiffs bring this application for a declaratory judgment and injunctive relief, pursuant to 28 U.S.C. §§ 2201 and 2202, against Defendants by way of Verified Complaint, seeking declaratory judgments that, on their face 12 *Del. C.* §1176 and 21 De. Admin. Code, 336 §§ 104-2.18, 2.19, which authorize the State Escheator to estimate the existence of unclaimed property and do so by extrapolating property

Delaware cannot claim, conflict with and are preempted by federal common law because (a) they authorize Defendants to estimate the existence of abandoned intangible property, thereby bypassing the threshold step required by federal law to identify legally enforceable fixed and certain debts that have been abandoned; (b) the estimation methodology in Delaware's regulations usurp federal law by ignoring owner addresses altogether and relying on property with owner addresses in other states (property Delaware cannot claim) to create aggregate rights to Delaware for abandoned property without proving the existence of individual property rights that Delaware can claim and return to owners; and (c) Defendants' audit of property with owner addresses in other states violates federal law because Delaware cannot claim such property, even if it is abandoned.

**Substantive and Procedural Due Process**

45.     Plaintiffs also bring claims for violations of the Due Process clause of the Fourteenth Amendment to the United States Constitution, both substantive and procedural.  As noted above, the UPL contains provisions authorizing estimation (12 *Del. C.* § 1176), requiring retention of records for fifteen years (*id.* § 1145), and another new provision requiring Delaware corporations to escheat to Delaware property with owner addresses outside the United States (*id.* § 1141(a)(3)).  The Delaware General Assembly expressly made the new UPL effective upon enactment on February 2, 2017 (*i.e.*, prospectively) (*See* Senate Bill 13, Synopsis, Exhibit I hereto), however Defendants are applying those provisions and the related regulations governing estimation (21 De Admin. Code 336 §§ 104-2.18, 104-2.19) retroactively in violation of due process.

46.     Defendants are applying these statutes retroactively solely to protect unclaimed property as a revenue source, not as a means of meeting owner claims and/or protect owners'

interests.  Delaware's unclaimed property fund is not suffering a shortfall, so there is no need to shift the burden of satisfying potential owner claims to private companies for property abandoned decades ago, especially where, as here, the percentage of funds Delaware returns to owners is in the single digits.

47.     Moreover, the UPL no longer facilitates the return of property abandoned decades ago.  The UPL used to provide that "[t]he State Escheator shall maintain a public record of all names and last known addresses of the person or persons appearing to be entitled to abandoned property paid or delivered to the State Escheator ....." *id*. § 1141 (repealed), and Delaware had a 30-year document retention policy for unclaimed property reports.  But the statutory provision was repealed, effective February 2, 2017, and was replaced with new § 1164, which only requires Delaware to retain copies of reports for ten years.

48.     As of 2016, Delaware had no history of returning property to ***any*** owner where the holder had escheated an estimated aggregate liability.  On information and belief, no such property has been paid to an owner since 2016 either.

49.     Defendants' retroactive application of the UPL is just one aspect of Defendants' conduct that "shocks the conscience" and violates due process.  For example, Delaware legislators and administrators knew that 90% of its escheat revenue consisted of "address unknown" property and if holders were warned to retain records, including records of owner addresses, unclaimed property revenue would fall dramatically.  (See 2001 Report (Exhibit C), at p. 5; 2008 Report (Exhibit D) at p. 8).

50.     The UPL's statute of limitations was ineffective to limit government enforcement and thereby limit Defendants' secret use of estimation to induce million-dollar settlements,

because it was not enacted until July 22, 2002, and applied only to reports filed after that date. *See* Senate Bill 420 (July 22, 2002) attached as Exhibit J.

51.     The statute provided that the "State Escheator, as soon as is practicable after receipt of any report required by this chapter, shall examine it to determine if it is correct." 12 *Del. C.* § 1158(a) (repealed 2/1/17).   But, "[n]o suit to enforce payment of a deficiency in payment .. shall be brought .. unless the notice of deficiency in payment is mailed to the holder within the 3-year period [after a report is filed]." *Id.*   If no report was filed, however, the State Escheator could bring an enforcement action "at any time". 12 *Del. C.* 1158(b).

52.     Delaware administrators and published Escheat Manuals advised companies not to file zero due reports if nothing was owed because "the Division of Revenue 'did not want to be flooded with a ton of $0 filings.'" (2014 Task Force Meeting (Exhibit F), at p. 11. Administrators deliberately failed to warn companies that the statute of limitations did not run if a report was not filed and the language in the statute did not state it was effective only for reports filed after July 22, 2002, thereby exposing earlier years to government enforcement and extortion practices indefinitely. *See Temple-Inland*, 192 F.Supp. 3d at 542-43 (describing the statute of limitations as a "critical issue.").

53.     The new UPL revised the statute of limitations to run from the date property was reportable (thereby running even if no report was filed). *See* 12 *Del. C.* § 1156(b).   However, the "period of limitation … is tolled by the State Escheator's delivery of a notice of an examination to a holder …" *Id.*   Therefore, companies under audit, such as Plaintiffs, do not benefit from the new statute of limitations.   Plaintiffs' audit is now in its eleventh year and the statute of limitations for transactions back to 1994 is still tolling.

54.     Defendants are applying the UPL record retention, estimation and foreign-owned property provisions retroactively, even though those provisions impose new duties with respect to transactions already completed as many as fifteen years ago and increase a party's liability for past conduct, including by subjecting companies to interest that adds 50% to the liability, half of which under the new UPL is now mandatory. *See* 12 *Del. C.* §§ 1183, 1185(b).

55.     Defendants also violate Plaintiffs' right to procedural due process by delegating the audit to Kelmar, a self-interested party.

56.     Further, at the start of this audit Defendants' predecessors required Plaintiffs to deposit funds with Delaware as an advance against any liability resulting from the audit, something no other company has been required to do and the UPL has never authorized the State Escheator to demand.  Plaintiffs deposited $7.4 million with Delaware on October 31, 2009 and after ten years of auditing five years of Base Period records for sixteen accounts payable disbursement accounts, six payroll disbursement accounts, four accounts receivable accounts, and one unapplied cash account, Kelmar's findings identified, at most, $1,762,325 of uncashed checks and customer credits with Delaware or unknown owner addresses that Delaware arguably can claim under federal law.  Almost all of this sum comes from SBT's records which cannot be researched due to lack of availability for years prior to 2006 and thus SBT lacks owner identities and addresses and cannot research them to determine if the checks and/or credits represent unpaid debts.  Plaintiffs seek a refund of at least $5,638,785, the excess portion of the deposit.

## PLAINTIFFS' CLAIMS ARE RIPE

57.     Plaintiffs' claims are ripe for several reasons.  Effective February 2, 2017, when Delaware repealed and replaced the UPL, there were approximately 335 companies under audit, many that, like Plaintiffs, had been under audit for many years.  To clear up the backlog and

expedite the collection of revenue, Delaware enacted a new "limited time offer" provision (12 *Del. C.* § 1172(c)), which required a company's written election notification by December 11, 2017 and provides:

> If the person provides the written notification … and responds within the time and in the manner established by the State Escheator to all requests for records, testimony, and information made by the person conducting the examination, the State Escheator shall complete the examination and provide an examination report under § 1177 of this title within 2 years from the date of receipt of the written notification and shall waive interest and penalty under §§ 1183 and 1184.

58.     In the absence of an election to expedite an audit, § 1183 imposes interest of 0.5% per month on outstanding unpaid amounts up to "50% of the amount required to be paid," 12 *Del. C.* § 1183, half of which now is mandatory, *id.* § 1185(b).  Because Defendants were auditing Plaintiffs for periods back to 1994, the interest calculation will reach 50% of any liability.

59.     To enable the State Escheator to conclude audits within two years, § 1172(c)(3) provides that "[a]ll requests for records, testimony, and information must be made by the person conducting the examination … no later than 18 months after the written notification under paragraph (c)(1) of this section," 12 *Del. C.* § 1172(c)(3), thereby allocating six months of the two-year period to afford the company the opportunity, if it so chooses, to research and rebut the presumption of abandonment assigned to large populations of checks and credits before the auditor's findings become final.

60.     On December 6, 2017, Plaintiffs, whose audit had been ongoing for eight years, elected to expedite their audits, which Defendants accepted in writing, thereby ensuring Plaintiffs' audit would conclude by December 6, 2019.  *See* Election to Expedite Audit, attached as <u>Exhibit K</u> hereto.  Plaintiffs had already responded to all of Kelmar's information requests and were in the "defense" phase of the audit in which they were researching to rebut the presumption

of abandonment for populations of uncashed checks and customer credits that Kelmar submitted (*see* Abandoned and Unclaimed Expedited Examination Process Overview, attached as <u>Exhibit L</u>), so Plaintiffs believed they could easily satisfy the requirements of an expedited audit within the two-year deadline.

61.     Kelmar nevertheless added thousands of checks and customer credits to the research populations in November 2017, thereby increasing the burden on Plaintiffs to complete the audit within two years.

62.     In December 2017, the Third Circuit published its opinion in *Marathon Petroleum*, ruling that a state can audit a company's books to determine whether Delaware can claim the property under the threshold step in the federal escheat analysis, but if Delaware lacked escheat jurisdiction, "then the audit is effectively at an end." *See Marathon Petroleum Corp. v. Sec'y of Finance*, 876 F.3d 481, 499 (3d Cir. 2017).  Any further audit of such property could be preempted. *Id.* at 501.

63.     Delaware's regulations make clear that researching to refute a presumption of abandonment is an option, not a requirement.  Regulation §§ 2.17.7 and 2.22.1 (which are identical) provide that "Holders shall be given ***the opportunity*** to review, reconcile, remediate and perform remediation outreach on any items that have been identified as potential unclaimed property."     21 De Admin. Code 336 §§ 104-2.17.7, 2.22.1 (emphasis added).

64.     Therefore, Plaintiffs chose to cease researching checks and credits with owner addresses in other states because Delaware lacked escheat authority over them under federal law. Further, many population items were not researchable due to a lack of records and thus Plaintiffs were unable to refute the presumption of abandonment and/or the items were for amounts as little as 5 cents and thus were *de minimis*.

65.     On June 11, 2019, Plaintiffs notified Kelmar that Plaintiffs had concluded their research and requested a final examination report as required by 12 *Del. C.* § 1177.

66.     Kelmar responded by issuing its audit findings as of June 2019 (which Ms. Sullivan approved) identifying $1,762,325 of presumptively abandoned uncashed checks and customer credits with unknown or Delaware addresses, a vast majority from SBT alone, whose records were not researchable and lacked owner identities and/or addresses, so there was no way to determine if those items represented unpaid debts.

67.     Rather than concluding the audit, Ms. Sullivan sent a letter to Plaintiffs on August 19, 2019 threatening to terminate Plaintiffs' expedited audit election (thereby depriving them of finality by December 6, 2019 and forfeiting the waiver of interest and penalties) because Plaintiffs had not, but (according to her) "must research and remediate *all* transactions to ensure a statistically sound sample and reasonable estimation," which she asserted comprised more than 9,000 open checks and credits.  *See* August 19, 2019 Letter (emphasis in original), attached as Exhibit M  hereto.

68.     Defendants rely on 12 *Del. C.* § 1176 and 21 De. Admin. Code 336 §§ 104-2.18 and 2.19 to require Plaintiffs to submit those 9,000 items to audit, most of which have owner addresses in other states and thus Delaware cannot claim them under federal law, even if they are unclaimed property.  But because Plaintiffs had exhausted their efforts to research open items with unknown or Delaware addresses, Delaware's audit of Plaintiffs was "at an end." *Marathon Petroleum*, 876 F.3d at 499.

69.     On December 11, 2019 (five days after the statutory deadline for concluding Plaintiffs' expedited audit), the State Escheator sent Plaintiffs a letter terminating Plaintiffs' election to expedite their audit because Plaintiffs "informed Delaware that it (sic) will not be

researching and providing remediation in connection with the entire sample of potential unclaimed property items," which consisted of checks and credits with owner addresses in other states that Delaware cannot claim under the *Texas* Trilogy.  *See* <u>Exhibit N</u>.  Consequently, Plaintiffs are injured because they are exposed to an unauthorized audit that is never ending and burdensome and covers property over which Delaware lacks escheat authority, Plaintiffs are deprived of finality, subjecting them to mandatory interest and penalties, and the statute of limitations tolls indefinitely (12 *Del. C.* § 1156(b)), and Defendants retain Plaintiffs' advance deposit indefinitely.

70.     Further, Plaintiffs' ability to defend themselves continues to diminish materially as time passes, employees' memories fade and/or leave for other employment opportunities, and accounting systems needed to defend the audit are replaced and become obsolete and/or inaccessible. On information and belief, Defendants have, at times, paused an audit by simply disappearing without explanation for as many as three years only to reappear and demand payment, including payments based on estimates about which few remaining employees would have any knowledge and/or could challenge effectively.

71.     Defendants' true reason for submitting the Interim Status Reports is to shock Plaintiffs into settling to avoid the outrageously inflated calculated liability.  Defendants refuse to conclude Plaintiffs' audit to prevent Plaintiffs from challenging Defendants' use of estimation, the continuing audit of property with owner addresses in other states, and retain the excessive deposit, if they do not issue a final demand for payment, thereby avoiding an injunction and judicial review of their audit conduct that generates Delaware's third largest source of revenue, conduct *Temple-Inland* held "shocks the conscience."  192 F.Supp. 3d at 550 ("To put the matter gently, defendants have engaged in a game of 'gotcha' that shocks the conscience.").

- 22 -

72.     Further, the UPL does not provide for pre-compliance review of Defendants' termination of their expedited audit and refusal to conclude the examination.

73.     Plaintiffs seek declarations by this Court that:

a.  The federal common law established in the *Texas* Trilogy bars Delaware from estimating the amount of unclaimed property it can claim from Plaintiffs;

b.  On their face, 12 *Del. C.* § 1176 and regulations 21 De Admin. Code 336 § 104-2.18 and § 104-2.19, which authorize estimation and authorize the State Escheator to ignore owner addresses to estimate abandoned property escheatable to Delaware, conflict with the federal common law in the *Texas* Trilogy and are preempted;

c.  The retroactive enforcement of 12 *Del. C.* § 1176 and regulations 21 De Admin. Code 336 § 104-2.18 and § 104-2.19, violates Plaintiffs' right to substantive due process;

d.  Defendants' audit of purported property with owner addresses in other states conflicts with the federal common law established in the *Texas* Trilogy and is preempted;

e.  Defendants' use of a contingent fee, self-interested auditor to conduct the audit and determine liability violates Plaintiffs' right to procedural due process; and

f.  The UPL violates due process and the Fourth Amendment to the U.S. Constitution because it does not provide for pre-enforcement review of Defendants' termination of Plaintiffs' expedited audit election.

74.     Plaintiffs seek an injunction enjoining Defendants from enforcing the UPL against Plaintiffs, including by auditing property with owner addresses in other states, by enforcing any

assessment against Plaintiffs based on such property, and by using self-interested auditors to conduct the audit.

75.     Plaintiffs' claims are ripe because they satisfy all of the requirements for ripeness as stated in *Step-Saver Data Sys., Inc. v. Wyse Technology*, 912 F.2d 643 (3d Cir. 1990):  (a) the parties' interests are adverse because Plaintiffs are challenging Defendants' authority to conduct an audit of property with owner addresses in other states that is currently ongoing; (b) any judgment by this court would be conclusive because it would definitively decide the parties' rights; if Defendants cannot rely on § 1176 and 21 De Admin Code 336 §§ 104-2.18 and 2.19, the audit will be at an end; (c) Plaintiffs would receive a refund of more than $5.6 million from the advance payment; and (d) a judgment would have practical value because it would clarify the parties' legal relationships and guide Defendants in making responsible decisions about the future, especially in light of their current refusal to comply with the rulings in *Temple-Inland*.

## THE PARTIES

76.     Delaware's audit of Siemens USA began in 2009.  At the beginning of the audit, the entities under audit were Siemens Building Technologies, Inc., Siemens Medical Solutions, USA, Inc., Siemens Financial Services, Inc., Siemens Power Generation, Inc., Siemens Energy & Automation, Inc., Siemens Transportation Systems, Inc., Siemens Shared Services, LLC, OSRAM Sylvania Products, Inc., Siemens IT Solutions and Services, Inc., and Siemens Capital Company, LLC.  Since then, there have been many changes in Siemens' company structure. Some of the entities originally under audit were sold during the audit. Other entities under audit were merged into other entities, renamed, or carved out as separate entities.  Delaware has treated the businesses included in this audit that are the subject of this Complaint as separate legal entities, notwithstanding changes in legal structure, and are described below.

77.     Siemens USA Holdings, Inc. is a Delaware corporation and is an indirectly owned subsidiary of Siemens AG, a German corporation located in Germany.  Siemens USA has a principal place of business at 300 New Jersey Ave. NW, Suite 1000, Washington D.C. 20001.

    a.  Siemens USA is the parent of Siemens Corporation, which at some time during this audit was the parent corporation of the entities listed in the subparts of this paragraph below.  Siemens Corporation is incorporated in Delaware and has a principal place of business at 300 New Jersey Avenue NW, Suite 1000, Washington D.C. 20001.

    b.  Siemens Corporation was the parent of Siemens Energy, Inc. ("Siemens Energy") during most of this audit and remains part of the audit and Complaint.  Siemens Energy was previously known as Siemens Power Generation Corporation.  Siemens Energy is a power and gas business with a hub in Orlando, Florida, and a global oil and gas business located in Houston, Texas.  Siemens Energy manufactures and services, *inter alia*, advanced fossil power generation equipment, such as gas and steam turbines and generators.

    c.  During most of this audit, Siemens Corporation was the parent of Siemens Medical Solutions USA, Inc. ("Siemens Medical"), and is part of this audit and Complaint.  Siemens Medical's successor is headquartered in Malvern, Pennsylvania.

    d.  Siemens Corporation was the parent of Siemens Shared Services, which is now part of Siemens Corporation and is based in Orlando, Florida.  Siemens Shared Services is part of this audit and Complaint and conducts back-office processes for Siemens Corporation's operating companies throughout the United States.

e.  Siemens Corporation is the parent of Siemens Industry, Inc., which is based at 100 Technology Drive, Alpharetta, Georgia, and which provides automation technologies and services for commercial, industrial and public buildings and infrastructures. On or about October 1, 2009, Siemens Energy and Automation, which is part of this audit and Complaint, merged into Siemens Building Technologies, Inc., which changed its name to Siemens Industry, Inc.  In addition, the Siemens' Building Technologies, Inc. ("SBT") business, which is the subject of this audit and Complaint, is in Buffalo Grove, Illinois, and it offers, *inter alia*, fire protection, life safety and security, as well as building automation, heating, ventilation and air condition and energy management.

f.  Siemens Transportation Systems, Inc. was merged into Siemens Industry, Inc. in October 2009.

g.  Siemens Financial Services, Inc. is a wholly owned subsidiary of Siemens Corporation with a principal place of business at 170 Wood Avenue, Iselin, New Jersey;

78.  Richard J. Geisenberger is the Delaware Secretary of Finance, located at Carvel State Office Building, 820 North French Street, Wilmington, Delaware.  Enforcement of the Delaware Escheat Law is vested in the Secretary of Finance or his/her delegate.

79.  Brenda Mayrack is the Secretary's delegate as the Delaware State Escheator, located at Carvel State Office building, 820 North French Street, Wilmington, Delaware and has authority to examine a company's books and records, take testimony, and issue and enforce administrative subpoenas to determine compliance with the Delaware Escheat Law, 12 *Del. C.*

§1171, and to bring a court action in the Delaware Court of Chancery, or a federal or state court having jurisdiction over a defendant for payment and delivery of abandoned property, *id.* §1180.

80.     Michelle M. Sullivan is the Delaware Assistant Director of the Office of Unclaimed Property and reports directly to, and under the direction of, the State Escheator, and oversees the conduct of an examination of books and records.

## JURISDICTION AND VENUE

81.     The Court has jurisdiction under 28 U.S.C. § 1331, as the case presents a controversy arising under the laws and Constitution of the United States.   Jurisdiction over claims for declaratory relief is conferred by 28 U.S.C. §§ 2201 and 2202.

82.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendants reside in the district and a substantial part of the events giving rise to the claim occurred in this district.

## FACTS CONCERNING DELAWARE'S AUDIT OF PLAINTIFFS

83.     In 2009, Delaware regulations provided that "[a]ny Holder who wishes to comply with the Delaware Abandoned or Unclaimed Property Law may file a VDA."  10 DE Reg 699 (10/1/06) (repealed 10/1/17).  The benefits of a VDA (*i.e.*, a voluntary disclosure agreement) included a shortened audit look back period and waiver of discretionary interest and penalties that otherwise could add as much as 50% to a liability.  A holder was barred from filing a VDA only if it had "received an audit letter or [was] currently under audit by the State of Delaware." *Id.*

84.     SBT decided to submit a VDA and retained BDO Seidman ("BDO") to assist in its self-audit to determine the amount of abandoned property SBT must report to Delaware.

85.     Just as SBT was about to file Form AP DE-1 (the required notice of an intent to file a VDA), Siemens USA's then Controller decided that many of Siemens USA's subsidiaries should join in and file VDAs together.   SBT's submission of its VDA was delayed while Siemens USA issued a request for proposal to consultants to assist in the self-audit of the SUSA entities and selected PriceWaterhouseCoopers ("PwC").

86.     On June 2, 2009 at 8:11 a.m., Robert Bazata, then of PwC, submitted a form AP DE-1 form to notify Delaware of SUSA's and SBT's intent to submit a VDA.  (*See* <u>Exhibit O</u>).

87.     Four minutes later, then State Escheator, Mark Udinski, responded by email rejecting the AP DE-1 stating "Siemens has been selected for audit, therefore the VDA request is rejected."  Mr. Udinski admitted both that Delaware had not notified Siemens of an audit and the regulations required such written notification to reject the VDA.

88.     Under Delaware regulations, the only remedy available to Mr. Udinski once Plaintiffs submitted the AP DE-1 was to accept the VDA, wait for Plaintiffs to complete and submit its report of self-audit with a form VDA-2, and conduct an examination of the self-report within three years.  If the self-audit materially under-reported the liability (by 25% or more), Mr. Udinski could reject the VDA and commence a full government audit with the extended audit look back period and imposition of interest and penalties.  *See* 10 DE Reg 699 (repealed 10/1/2017).

89.     On July 11, 2009, Mr. Udinski and then Delaware Deputy Attorney General, Pat Hurley, met with Siemens USA's then Controller, Siemens' then associate general counsel, and Diane Green-Kelly (outside counsel from Reed Smith LLP) at Siemens' offices in Iselin, New Jersey.   At that meeting, Messrs. Udinski and Hurley refused to change their position and

rejected Plaintiffs' AP DE-1 submission, notwithstanding Delaware regulations barring them from doing so.

90.     The regulations did not provide pre-compliance review and/or a remedy for Plaintiffs to address the standoff.  Plaintiffs knew that even if Mr. Udinski accepted the VDA, he could audit the VDA within 3 years, and as Plaintiffs soon learned, Mr. Udinski's auditors would manipulate the findings by estimating an inflated liability, thereby ensuring the self-report was materially under-stated and enabling Mr. Udinski to justify revoking the VDA.

91.     Thus, on November 12, 2009, Plaintiffs had no practical alternative but to enter into the confidential Letter Agreement, that Messrs. Udinski and Hurley proposed to govern Delaware's audit, while allowing Plaintiffs to retain some of the benefits of the VDA.

92.     The Letter Agreement granted Plaintiffs the benefits of the VDA's shortened look back period and granted all Plaintiffs, except SBT, a waiver of interest/penalties, but subjected all Plaintiffs to a Delaware audit.  Contrary to Delaware VDA or audit practice (or any statutory or regulatory authorization), the Letter Agreement required SBT to make a substantial advance deposit against audit liability.  If, after the audit, the SBT deposit exceeded its audit liability, the Letter Agreement required Delaware to refund the excess by applying it to any liability owed by the SUSA entities; if the payment materially under reported SBT's audit liability (by 25% or more), it faced an expanded audit look back period and other adverse consequences.

93.     The Letter Agreement required full cooperation by Plaintiffs to retain the benefits. Defendants were required to notify Plaintiffs in advance if it appeared that its audit conduct was uncooperative in order to afford Plaintiffs the chance to take corrective action and avoid forfeiting those benefits.

94.     SBT submitted its deposit as required by the Letter Agreement in the amount of $7.4 million on October 31, 2009.  BDO was familiar with Defendants' estimation methodology, which *Temple-Inland* rejected seven years later.  Plaintiffs instructed BDO deliberately to over-estimate the payment based on a very high-level review and unproven, but conservative, assumptions, and without the benefit of *any* remediation efforts to reduce liability because Plaintiffs knew that the Letter Agreement expressly permitted them to recover any overpayment and would minimize the risk of underpayment that would require them to forfeit the shortened audit period and waiver of interest and penalties.

95.     Mr. Udinski and Mr. Hurley delegated the conduct of the audit to Kelmar.

96.     Delaware has paid Kelmar hundreds of millions of dollars in fees for auditing services.  In fiscal 2013 alone, the Delaware Department of Finance paid Kelmar fees for auditing services in the amount of $53,494,091.25.  *See http://checkbook.delaware.gov.*

97.     Within a few months of negotiating the Letter Agreement, Pat Hurley retired and went to work in the legal department at Kelmar.  Mr. Udinski followed in August 2013 and became a Managing Director (highest office under the founders/owners) at Kelmar, but not before issuing 125 audit notices to Delaware incorporated companies, 90% of which he assigned to Kelmar, whose compensation is contingent on the liability collected in an audit.  *See* https://blogs.wsj.com/cfo/2013/08/20/delaware-job-hop-stirs-flap.  *See* Exhibit H.  Both men remain employed by Kelmar today.

98.     Presumably because Delaware already had a substantial deposit from SBT, Delaware believed there was no urgency to conduct the audit.  It was not until October 23, 2010, almost a year after executing the Letter Agreement, that Kelmar submitted its first request for the production of information to Plaintiffs for voluminous records for periods back to 1991.

99.     On November 23, 2010, Mr. Udinski sent an email to Plaintiffs' in-house counsel (attached as Exhibit P) stating that the use of statistical sampling and estimation were an option, not a requirement, stating, in part:

> Abandoned property by its nature is an individual transaction-based review process, however where there is a very large universe of data to be researched, Delaware has often agreed with Holders to use statistical sampling. Delaware has routinely used statistical sampling with a 90% confidence factor and 10% precision rate, however the sampling standard is negotiable. For obvious reasons Delaware would need to make the selections based upon the agreed-to criteria. It is important to remember that Delaware does not require, nor does it necessarily desire to utilize statistical sampling, which by its nature adds a modicum of inaccuracy back to the equation. The concept of statistical sampling is an option that is entirely at the request of the holder and carries with it the holder's benefit of an economized amount of work. As I mentioned, it does create the possibility that the resulting calculated liability may be slightly higher or lower than if every item had been researched. Should you choose to pursue the use of statistical sampling and Delaware agrees to it, both Delaware and the Holder should be bound to the result.

100.     In April 2014 through April 2015, after Kelmar had received and reviewed voluminous records produced, some dating as far back as 2002, by Plaintiffs over the years, Plaintiffs and Kelmar debated the use of estimation to establish a liability to Delaware. On May 7, 2015, Diane Green-Kelly wrote a letter to Michelle Sullivan (then Whitaker) objecting to the use of estimation and the specific methodology Kelmar proposed to use, which would rely on property with owner addresses in states other than Delaware.

101.     In 2014 and 2015, Kelmar nevertheless submitted populations of thousands of uncashed and voided checks, customer credits, and cash receipts from five years of records from sixteen accounts payable disbursements accounts, six payroll disbursements accounts, accounts receivable agings for four entities, and SBT's unapplied cash account for the purpose of estimating a liability, more than 9,000 items of which had owner addresses in other states. Plaintiffs were given the opportunity to research and rebut the presumption of abandonment assigned to those items.

102. The populations Kelmar submitted to SBT for research included items selected from years prior to 2006, which, as SBT informed Kelmar in 2010, were not researchable due to system changes and destruction by fire. Kelmar explained that these populations nevertheless would be used to estimate a liability escheatable to Delaware. Plaintiffs repeatedly objected to Kelmar's reliance on non-researchable records to select populations of checks and credits for research. But Kelmar, with Ms. Sullivan's concurrence, refused to revise the populations for SBT.

103. On July 19, 2016, Diane Green-Kelly sent an email to Michelle Sullivan requesting a call to discuss Delaware's stated intent to continue estimating holder liability despite the recent decision in *Temple-Inland* where this Court held that, *inter alia,* Delaware's use of estimation methodology violated due process. *See Temple-Inland*, 192 F.Supp. 3d at 549. Ms. Sullivan finally agreed to a discussion on August 10, 2016 and confirmed Delaware's intent to continue using estimation in the manner rejected in *Temple-Inland.*

104. Effective February 2, 2017, Delaware repealed and replaced its escheat statute, which shortened the audit look back period for Plaintiffs to 1994 (from 1991) and effective October 1, 2017, the Secretary of Finance promulgated regulations that (1) confirmed the use of estimation in the absence of records based on property with owner addresses in other states (De Admin. Code §§ 104-2.18 and 2.19), the estimation method rejected in *Temple-Inland*, but (2) required the surrogate Base Years used in any estimate to be comprised of "complete and researchable records" (*id.* §§ 2.18.2 and 2.20).

105. Kelmar nevertheless refused to remove items from the non-researchable research populations, notwithstanding Delaware's new regulation barring the use of such records.

106.     On December 6, 2017, Ms. Sullivan confirmed receipt of Siemen's election to expedite its audit and on January 16, 2018, Ms. Mayrack, as State Escheator, accepted Siemens' election to expedite the audit, thereby mutually agreeing to supersede the portion of the Letter Agreement affecting interest and penalties.  See Exhibit K hereto.  According to a written audit Work Plan, Defendants considered Plaintiffs' audit to be in "Phase III."  See Exhibit 2 to Exhibit K hereto.

107.     Delaware's published announcements described Phase III as the phase of the audit *after* the auditors have completed data collection and Plaintiffs have "the opportunity to review, reconcile, remediate and perform remediation outreach on any items that have been identified as potential unclaimed property."  *See* 21 De Admin. Code 336 § 104-2.22.1; *see also id.* § 104-2.17.7 (identical).

108.     Plaintiffs performed research and produced remediation documentation to Kelmar for all items regardless of owner addresses until the Third Circuit issued its opinion in *Marathon Petroleum* in December 2017 holding that an audit of property over which Delaware lacked escheat jurisdiction could be preempted by federal law and a company under audit could "simply refuse to cooperate."  *See Marathon Petroleum*, 876 F.3d at 497; *see also id.* 499-501. Thereafter, Plaintiffs focused and exhausted its research efforts only on checks and customer credits over which Delaware would have escheat jurisdiction under federal law and items with foreign owners (because the legality of Delaware's retroactive application of § 1141(a)(3) requiring Delaware corporations to escheat foreign owned property was unsettled).

109.     Plaintiffs then requested a final examination report.  Kelmar produced two Interim Status Reports (one for SUSA and one for SBT) on June 10, 2019 that Ms. Sullivan reviewed and approved.  *See* Exhibits A and B.

- 33 -

110.    On July 15, 2019, in a telephone conference with Ms. Sullivan, Ms. Mayrack, Frank Molinaro of Siemens, and Diane Green-Kelly, Ms. Green-Kelly and Mr. Molinaro again informed Delaware that Plaintiffs had exhausted all efforts to remediate any further items, and requested a final report of examination and Statement of Findings and Request for Payment as required by 12 *Del. C.* §§ 1177, 1179(a).  In response, Ms. Mayrack threatened Plaintiffs that she would exercise her discretion to terminate Plaintiffs' participation in the expedited audit if Plaintiffs did not remediate the remaining population items with owner addresses in other states, which she asserted consisted of at least 6,000 items.

111.    Ms. Mayrack stated in substance that she would terminate the expedited audit election to avoid enabling Plaintiffs to file a lawsuit to challenge the use of estimation.  But the UPL does not provide for pre-compliance review of Ms. Mayrack's decision.  She state in her termination letter that "[t]he Secretary of Finance has reviewed and approved this Determination," *see* Exhibit N, however, Plaintiffs were deprived the opportunity to present their case to the Secretary.

112.    Kelmar's June 10, 2019 Interim Status Reports identified from five years of records for all eight entities combined, $1,762,325 million checks and credits with Delaware addresses and/or unknown addresses (attributable primarily to SBT accounts for which no researchable records were available) and $566 thousand of such items with foreign owners (although Kelmar later accepted remediation for approximately $186 thousand of this amount). Yet, Kelmar ***estimated*** an additional liability of $37.8 million for seven years for which records were not available (although the estimation period for some of Plaintiffs entities was for a shorter period because they were not in existence the entire seven years).

**Delaware's Estimation Formula Produces Significantly Misleading Results**

**Audit of Plaintiffs' Accounts Payable Disbursements.**

113.    In response to Kelmar's information requests, the SUSA entities produced bank statements, bank reconciliations, check registers, and related bank records for thirteen bank accounts from which accounts payable were paid and similar records for six bank accounts from which payroll was disbursed for periods 2002 through 2006.  SBT produced records for 2004-2006, although only 2006 records were researchable.

114.    As Kelmar's Interim Status Reports show, Plaintiffs disclosed its unclaimed property report filings, which showed they had already escheated $1,407,728.33 for the five Base Periods and $ 5,183,177.47 for the Reach Back Period.  *See* Exhibits A and B Columns B and C or each calculation.

115.    Kelmar assigned a presumption of abandonment to "aged checks" – *i.e.*, checks outstanding 90 or more days from issuance and checks voided 30 or more days from issuance – and submitted thousands of them to Plaintiffs, giving them the opportunity to conduct research to refute the presumption of abandonment.  Kelmar's arbitrary presumption of abandonment was not based on facts related to Plaintiffs and/or published peer review studies.

116.    After Plaintiffs exhausted their research of items with unknown owner addresses or addresses in Delaware and foreign countries, Kelmar identified relatively few unreported abandoned checks with payee addresses in Delaware (that Delaware could claim under the primary rule) or lacking an address (that Delaware could claim under the secondary rule).  For example:

      a.  For Siemens Power, Kelmar identified from five years of records from one accounts payable bank account ("SPG AP1.1), $161.41 of unreported aged checks with payee addresses in either Delaware ($83.19) or lacking an address ($78.27)

(an average of $32.28/year), yet Kelmar estimated a liability of $776,358.99 for five years where records did not exist (an average of $155,271.80/year). The estimated liability was 3,930 times the actual amount Delaware could claim under federal law. <u>Exhibit A,</u> p. 3, Columns 14 and 16<u>.</u>

b. For Siemens Medical, Kelmar identified from five years of records from one payroll disbursements bank account ("SMS PR 2.1"), $2,211.72 of aged checks with a Delaware or unknown payee address (an average $442.34/year), yet Kelmar estimated a liability of $856,744.05 for the eight years lacking records (an average of $107,093.00/year). <u>Exhibit A,</u> p. 10, Column 14.

c. For Siemens Energy, Kelmar identified from five years of records for one payroll disbursements bank account ("SEA PR3.1"), $5,786.56 of unreported aged checks with a Delaware or unknown payee address ($635.61 with Delaware addresses and $4,140.95 lacking an address for a combined average of $1,156.31/year), yet Kelmar estimated a liability of $498,673.80 for the eight years lacking records (an average of $62,334.22/year). <u>Exhibit A,</u> p. 16, Columns 14 and 16.

d. For Siemens Medical Solutions, Kelmar identified from five years of records for one accounts payable bank account ("SMSHS AP4.1"), $242.00 of unreported aged checks with a Delaware or unknown payee address (an average of $48.40/year), yet Kelmar estimated a liability of $2,369,703.34 for the seven years lacking records (an average of $338,529/year). <u>Exhibit A,</u> p. 18, Columns 14 and 16.

e. For Siemens Transportation, Kelmar identified from five years of records for one accounts payable bank account ("STS AP5.1"), $17.92 of checks with a Delaware

or unknown payee address (an average of $3.58/year), yet Kelmar estimated a liability of $455,291.76 for the eight years lacking records (an average of $56,911.57/year).  Exhibit A, p. 20, Column 16.

f.   For Siemens Financial, Kelmar identified from three years of records for one accounts payable bank account ("SFS AP6.1"), $656.35 of aged checks with Delaware or unknown payee addresses (an average of $218.78/year), yet Kelmar estimate a liability of $3,081,929.05 for the eleven years lacking records (an average of $280,175.37/year).  Exhibit A, p. 24, Column 16.

g.   For SBT, Kelmar identified from five years of records for one accounts payable bank account ("SBT AP1.4"), $504.65 of aged checks with a Delaware or unknown payee address (an average of $100.93/year), yet Kelmar estimated a liability of $599,729.30 for the eight years lacking records (an average of $74,966.16/year).  Exhibit B, p. 8, Column 16.

117.   Kelmar and Defendants estimated the liability by multiplying Plaintiffs' revenue in each of the Reach Back Periods by an "escheat percentage" or "error rate" calculated from a review of the Base Years, which were used as a surrogate.

118.   The escheat percentage is calculated from a fraction:  the numerator is the sum of aged checks (including checks with payee addresses in other states, most of which Plaintiffs did not research) in the Base Years for which Plaintiffs did not successfully refute Defendants' presumption of abandonment, plus aged checks previously escheated to all other states combined in the Base Years, plus checks voided and  replaced and paid to payees during the reviewed period (which thus are not unclaimed property), and aged checks payable to payees with

addresses in states that exempt from escheat checks issued in business-to-business ("B2B") transactions.

119.     The denominator of the fraction is Plaintiffs' total combined revenue in the Base Years albeit without any evidence that Plaintiffs' revenue has any relationship to the amount of checks payees abandon.  The fraction is converted to a percentage (the "escheat percentage" or "error rate") which is multiplied by revenue for each year in the audit Reach Back Period to estimate a liability for an aggregate of purported unpaid debts to vendors and employees escheatable to Delaware for years where records no longer exist.

120.     This is the same estimation methodology that in *Temple-Inland*, this Court held produced "significantly misleading results" based on an interpretation of federal law that went to "troubling lengths" and violated due process.  *See Temple-Inland*, 192 F.Supp. 3d at 535-37 (describing the estimation methodology).

121.     Defendants provided no factual or legal basis for using revenue in the denominator, other than saying it was available from federal tax returns, and Defendants did not demonstrate that revenue is a predictor of the number or amount of aged vendor or employee payroll checks that represent abandoned debts.

122.     The fact that an owner fails to claim property has to do with ***the owner's*** motives, practices and conscientiousness, not the holder's revenues.  The debtor's revenues increase and decrease based on demand, competition, marketing, and sales efforts, as well as quality of service or products.  The number of vendors and/or the dollar amount of checks that represent abandoned debts does not increase or decrease in any way related to the success of the holder's marketing efforts.

123.    Delaware's Department of Finance recognized that because "revenues collected in any given year are based on assets that were 'abandoned at least five years ago," unclaimed property revenue "cannot be expected to respond to current economic conditions …." *See* 2001 Report (Exhibit C), at p. 64.

124.    The findings in Kelmar's Interim Status Reports demonstrate that revenue is not a predictor of Plaintiffs' uncashed checks.  For example, the Interim Status Report for Siemens Energy payroll disbursements account (PR3.1) refutes any relationship between revenue and abandoned vendor debts (*see* Exhibit A, p. 16, compare columns 3 with columns 8):

| Year | Audit Findings: Unclaimed Property (Exhibit A, p. 16, Col. 17) | Revenue (Exhibit A, p. 16, Column 8) | Escheat Percentage |
|---|---|---|---|
| 2006 | $          636 | $ 2,539,318,735 | .000025% |
| 2005 | $          3,940 | $ 2,130,046,562 | .0001849% |
| 2004 | $          0 | $ 2,002,112,672 | .00% |
| 2003 | $          0 | $ 1,912,798,660 | .00% |
| 2002 | $          9,851 | $ 1,945,798,660 | .00025063% |

125.    As the above figures show, which are Kelmar's audit findings approved by Defendants, when revenues decreased between 2002 and 2003 by $33 million (1.7%), the amount escheated decreased by 100%; when revenues increased between 2003 and 2004 by 4.7%, unclaimed property escheatable to Delaware remained unchanged at zero.

126.    The findings in Kelmar's Interim Status Reports for the other Plaintiffs similarly disclose a complete absence of any relationship between Plaintiffs' revenues and the amount of abandoned property they owe to Delaware.

**Audit of Customer Credits**

127.    Kelmar also audited customer credits by selecting a population of credits for research from records of all customer transactions recorded during the Base Periods.

128.    Using the same methodology they used for disbursements, Defendants estimated a liability to Delaware for years back to 1994 based entirely on extrapolations of credits of customers with addresses in all other states combined, credits that Plaintiffs actually escheated to all other states for the Base Period, credits Plaintiffs repaid to customers (and thus are not unclaimed property), credits Plaintiffs were permitted to retain because of a B2B exemption in the state with escheat authority over the credits, credits of customers in foreign countries, and credits Plaintiffs did not research because the state of the owner's address was outside of Delaware.

129.    Similar to the disbursements findings, Kelmar's findings regarding customer credits were equally unreasonable.  For example, from SBT's accounts receivable records for the two-year period September 2006 to September 2008, Kelmar identified $400.54 of credits with customer addresses in Delaware and $6,721.99 lacking a customer address (on average $3,561.28/year), yet Kelmar estimated a liability of $3,691,971.02 for the thirteen years lacking records (an average of $283,997.77/year).  *See* Exhibit B, p. 13, Colum 19 (*i.e.*, $3,703,642.41 - $11,671.39)

**Foreign Owned Property**

130.    It was not until February 2, 2017 that Delaware law for the first time required a holder incorporated in Delaware to escheat property where the last known address of the owner is in a foreign country.  12 *Del. C.* §1141(a)(3).

131.    Defendants claim this statute merely codifies existing practice.  However, if that was true, it was a well-kept secret.  Delaware's Escheat Manuals published before this audit commenced did not mention foreign owned property and Delaware took no steps over the years designed to notify Delaware incorporated entities that they should escheat this property and/or notify foreign owners that Delaware has custody of their property.  Most foreign owners are unfamiliar with U.S. unclaimed property laws and would have no reason to look for property in Delaware when they did business with Plaintiffs in, *inter alia*, New Jersey, Illinois or Georgia.

132.    In fiscal 2018, Delaware's returns to owners was only 8.2% of abandoned property revenue.  On information and belief, Delaware's returns of the subset of property owned by foreign owners is even less.

133.    Further, in March 2018, Ms. Mayrack informed the Delaware Economic and Finance Committee ("DEFAC") that she was increasing scrutiny of foreign owners seeking to reclaim property, which bolstered DEFAC's decision to increase revenue projections from unclaimed property by $50 million over 2 years.  *See* www.finance.delaware.gov/financial-reports/dfac-revenue-forecast/ meeting minutes dated March 19, 2018, p. 6.

**Plaintiffs Face The Risk Of Liability To Multiple States**

134.    As this Court noted in *Temple-Inland*, "if two states use the same property in the base years to infer the existence of unclaimed property in the reach back years, then a holder is

being compelled to escheat the same estimated property to two states in violation of the principles articulated in the *Texas* cases." *Temple-Inland*, 192 F.Supp. 3d at 549-50.

135.    New York conducted an audit of Plaintiffs beginning in 2014 and concluded the audit in 2015, resulting in a payment to New York for $6,220.02 for uncashed accounts payable checks and $88,436.19 for unclaimed customer credits.

136.    Kelmar's and Defendants' findings of liability to Delaware are based in part on extrapolations of aged checks and customer credits with New Yorker addresses. Delaware's reliance on property escheatable to New York interferes with New York's sovereign authority to settle abandoned property liabilities under its jurisdiction pursuant to federal law. *See Marathon Petroleum Comp. v. Sec'y of Finance*, 876 F.3d 481, 491-92 (3d Cir. 2017) (citing *N.J. Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 395 (3d Cir. 2012)).

## COUNT I

### (Violation of And Preemption by Federal Common Law)

137.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

138.    The Supreme Court, pursuant to its exercise of original jurisdiction, established the federal law through which states determine their respective rights to unclaimed property.

139.    The Supreme Court expressly held that "no State may supersede the[] [priority rules]," *Delaware*, 507 U.S. at 500, and "[i]nsofar as the invocation of any provision of the Revised Uniform Disposition of Unclaimed Property Act would be inconsistent with this decree, the decree prevails," *Pennsylvania*, 407 U.S. at 216 n.8.

140.    States can claim only the rights to property that the true owner possesses. Consistent with those "derivative rights," the Supreme Court held that the threshold step before a state can claim unclaimed property is to identify the obligations by looking to the state law that

gives rise to the obligations.  Doing so identifies the escheatable property, as well as the debtor and creditor.

141.    The federal law analysis then requires a state to rely on the debtor's records for the creditor's address to determine which state is allowed to claim each item of abandoned property.

142.    The Supreme Court expressly rejected the use of statistical surrogates and estimation in place of the debtor's books and records to decide which state will be allowed to claim abandoned property under federal law.

143.    If two states can establish the existence of unclaimed property by extrapolating the same "property," a holder is compelled to escheat the same estimated "property" to two states.  But the Supreme Court held that "the same property cannot constitutionally be escheated by more than one state." *Texas*, 379 U.S. at 678-79.

144.    Because more than 94% of Defendants' findings consist of an estimate of unclaimed property, they violate the federal common law by ignoring the threshold step in the priority rule analysis to identify individual debts and ignoring the requirement to rely on the debtor's records to determine whether the state is allowed to take custody of property.

145.    The Supreme Court said it could have established a federal law any number of ways, but the law was adopted because it was easy to administer, and the Supreme Court did not want to decide escheats on a case-by-case basis based on particular facts.  *Texas*, 379 U.S. at 681.

146.    The use of estimation inserts fact issues that require a court to decide whether the estimation methodology is reasonable on a case-by-case basis, including determining whether

revenue is a predictor of unclaimed property for specific holders, and thus conflicts with federal policy.

147.    Plaintiffs already settled their past liabilities to New York through 2014, yet Defendants estimated a liability based on extrapolations of unclaimed property with owner addresses in New York, thereby interfering with New York's sovereign rights to settle unclaimed property liabilities.

148.    Defendants' findings also include foreign owned property, even though foreign jurisdictions place conflicting demands and restrictions on what holders can do with such property.

149.    Therefore, Plaintiffs request a declaratory judgment that §1176 of the UPL and regulations sections 21 DE Admin. Code 336 §§ 104-2.18, 2.19, on their face, violate the federal common law and are preempted and ask the Court to permanently enjoin Defendants from enforcing the UPL against Plaintiffs by auditing property with owner addresses in other states, and order Defendants to refund $5.6 million of the payment Plaintiffs made in October 2009.

## COUNT II

### (Substantive Due Process Under The Fourteenth Amendment To The U.S. Constitution)

150.    Plaintiffs repeat and reallege the forgoing paragraphs as if fully set forth herein.

151.    The Due Process clause of the Fourteenth Amendment to the U.S. Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." *See* U.S. Const. amend. XIV, § 1.

152.    Due process guarantees Plaintiffs "an opportunity to present every available defense." *Phillip Morris USA v. Williams*, 549 U.S. 346, 352 (2007). Plaintiffs are deprived of due process because more than 94% of Defendants' findings consist of an estimate of an

aggregated amount and Plaintiffs cannot defend against individual claims, by showing, for example, that any particular debt was not actually owed or that Plaintiffs had a right of offset.

153.    Defendants' use of estimation and reliance on records that are not researchable deprives Plaintiffs of their ability to defend against an unreasonable estimate.

154.    This Court already held in *Temple-Inland* that Delaware's retroactive application of the UPL's estimation statute does not withstand constitutional scrutiny.   *Temple-Inland*, F.Supp. 3d at 547-48.

155.    The use of estimation makes it harder for owners to reclaim their property because an estimate does not identify the owner, the property, the date of the transaction, and/or the property's value.   Yet, Delaware will not return property to owners if the property is not found in the owner's name.   *See Temple-Inland*, 192 F.Supp. 3d at 547-48.   As of at least 2016, Delaware had no evidence that it ever returned any property to an owner where the holder had escheated an estimated liability.

156.    As a result, the vast majority of the unclaimed property that Delaware obtains from examinations of holders serves solely as a revenue source for the state with no intent of reuniting property with owners.

157.    The Delaware unclaimed property fund is not experiencing a financial shortfall because it has collected hundreds of millions of dollars more than it has paid out to owners.

158.    As Justice Alito has noted (with Justice Thomas joining), "[c]ash-strapped States undoubtedly have a real interest in taking advantage of truly abandoned property to shore up state budgets.   But they also have an obligation to return property when its owner can be located."   *Taylor v. Yee*, 136 S.Ct. 929, 930 (2016), *denying cert*, (Alito, J., concurring) (citing

Delaware law as an example of a statute containing "decidedly old-fashioned methods that are unlikely to be effective" in reuniting property with owners.)

159.     Delaware's interest in revenue for the State is outside the primary purpose and public policy of unclaimed property laws, which is to hold property for the rightful owners as a custodian until the owners reclaim it and is insufficient to overcome Plaintiff's legitimate property interest, in violation of the Fourteenth Amendment to the U.S. Constitution.

160.     Further, Delaware law for the first time required a holder incorporated in Delaware to escheat property where the last known address of the owner is in a foreign country, whereas prior law did not contain the same requirement.

161.     Defendants rely on the use of contingent fee auditors whose financial self-interest influences the conduct and results of the audit.

162.     Therefore, Plaintiffs seek a declaratory judgment that Defendants violate Plaintiffs' right to substantive due process and seek an injunction enjoining Defendants from continuing its unlawful audit of Plaintiffs and ordering Defendants to refund $5.6 million of the payment made in October 2009.

## COUNT III

### (Procedural Due Process Under The Fourteenth Amendment To The U.S. Constitution)

163.     Plaintiffs repeat and reallege the forgoing paragraphs as if fully set forth herein.

164.     The Due Process clause of the Fourteenth Amendment to the U.S. Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  *See* U.S. Const. amend. XIV, § 1.

165.    Due process requires "that a deprivation of the liberty or property preceded by notice and opportunity for hearing appropriate to the nature of the case." *Biliski v. Red Clay Consol. Sch. Bd. of Educ.*, 574 F.3d 214, 220 (3d Cir. 2009).

166.    Here, Defendants refuse to conclude Plaintiffs' audit by the statutory deadline, thereby subjecting Plaintiffs to mandatory interest and penalties.  However, the UPL does not provide for pre-compliance review by a neutral arbiter and thus Plaintiffs were denied the opportunity to defend against the refusal to terminate their audit and the loss of the associated benefits.  The Secretary rubber-stamped the State Escheator's decision, but Plaintiffs were not afforded an opportunity to present their case to the Secretary.

167.    Further, Defendants rely on the use of contingent fee auditors whose financial self-interest influences the conduct and results of the audit.

168.    Kelmar selected the populations to which to apply the presumption of abandonment for research (including items that could not researched due to a lack of records), made evidentiary determinations, and calculated estimated liabilities.

169.    Therefore, Plaintiffs seek a declaratory judgment that Defendants violate Plaintiffs' right to procedural due process and seek an injunction enjoining Defendants from continuing its unlawful audit of Plaintiffs.

## COUNT IV

**(Violation of the Fourth Amendment to the United States Constitution)**

170.    Plaintiffs repeat and reallege the forgoing paragraphs as if fully set forth herein.

171.    The Fourth Amendment to the U.S. Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause,

supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things." U.S. Const., amend IV.

172.    The UPL expressly authorized Plaintiffs to elect to expedite the conclusion of their audit within two years and obtain a waiver of interest and penalties. 12 *Del. C.* § 1172(c). Plaintiffs' only obligation was to respond to requests for information in the time and manner requested by the auditors. *See id.* § 1172(c)(2).

173.    As provided in Exhibit A to the notice of election to expedite the audit (Exhibit K), Plaintiffs were in Phase III of the audit at the time they made their election. Phase III is the phase in which the holder has already responded to requests for information and is in the defensive stage of the audit. Therefore, Plaintiffs had already complied with their obligation to respond to requests for information in the time and manner requested by the auditors.

174.    Nevertheless, Defendants refused to issue a final report and demand payment from Plaintiffs because Plaintiffs did not research to rebut the presumption of abandonment for items with owner addresses in other states and items for which records were no longer available (which is impossible to do). As a result, Plaintiffs are subject to mandatory interest, potential penalties, an unauthorized audit, an indefinite tolling of the statute of limitations against enforcement, and Plaintiffs cannot obtain a refund of the advance payment they made that substantially exceeds their obligations to Delaware under federal law.

175.    Because interest and penalties are calculated as a percentage of the amount of the audit liability for the period of time between the date the property was reportable and the date paid, if Plaintiffs are required to wait to resolve the federal preemption and U.S. Constitutional issues until Defendants decide it is time to conclude the audit and issue a final determination of liability, those penalties and interest will continue to accrue.

176.    The UPL does not provide for pre-compliance review of Defendants' termination of an expedite audit election and therefore facially violates the Fourth Amendment. *See City of Los Angeles v. Patel*, 135 S.Ct. 2443 (2015).

177.    Plaintiffs seek a declaratory judgment that the UPL facially violates the Fourth Amendment to the U.S. Constitution and seek an injunction requiring Defendants to cease its audit of property with owner addresses in other states and to refund the $5.6 million that Plaintiffs have over paid.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that the Court enter an order:

A.    Declaring that a state cannot estimate the existence of unclaimed property under the *Texas* Trilogy.

B.    Declaring that 12 *Del. C.* § 1176 facially conflicts with and is preempted by federal common law because it authorizes the State Escheator to ignore the first step under federal law which is to identify legally enforceable fixed and certain property interests by using holder's books and records and thus is not enforceable.

C.    Declaring that 21 De Admin. Code 336 §§ 104-2.18 and 2.19 facially violate federal common law and are preempted because they authorize the State Escheator to ignore owner addresses to determine the amount of abandoned property Delaware may claim and thus are not enforceable;

D.    Declaring that Delaware's audit of property with owner addresses in other states violates federal common law and is preempted because the result of an audit of such property would be preempted;

F.      Declaring that retroactive enforcement of 12 *Del. C.* § 1176 (and its predecessor § 1155) and § 1145 violate Plaintiffs' right to substantive due process as guaranteed by the Fourteenth Amendment to the U.S. Constitution;

E.      Declaring that retroactive application of 12 *Del. C.* § 1141(a)(3) requiring Delaware corporations to escheat property with foreign owners violates Plaintiffs' right to substantive due process as guaranteed by the Fourteenth Amendment to the U.S. Constitution;

F.      Declaring the UPL facially violates the Fourth Amendment to the U.S. Constitution because it does not provide for pre-compliance review of the State Escheator's decision to terminate Plaintiffs' expedited audit by the statutory deadline of December 6, 2019.

G.      Enjoining each Defendant from enforcing 12 *Del. C.* § 1176 and 21 De Admin. Code 336 §§ 104-2.18 and 2.19 against Plaintiff by auditing property with owner addresses in other states and/or estimating a liability for unclaimed property escheatable to Delaware;

H.      Enjoining each Defendant from enforcing payment of an assessment based on estimated liability and/or property with foreign owners (or any part thereof);

I.      Awarding Plaintiffs a refund of $5,638,785 from the advance deposit;

J.      Enjoining each Defendant from assessing penalties and/or interest;

K.      Awarding attorneys' fees and costs of defense; and

L.      Awarding such other and further relief as the Court deems just and equitable.

Dated:  December 17, 2019

OF COUNSEL:

REED SMITH LLP
Diane Green Kelly
10 South Wacker Drive, 40th Floor
Chicago, IL 60606
Telephone:  (312) 207-1000
Fax: (312) 207-6400
dgreenkelly@reedsmith.com

REED SMITH LLP

/s/ R. Eric Hutz
R. Eric Hutz (No. 2702)
1201 Market Street, Suite 1500
Wilmington, DE 19801
Telephone:  (302) 778-7500
Fax:  (302) 778-7575
ehutz@reedsmith.com


*Counsel for Plaintiffs*